**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

|  |  |
|---|---|
| LATOYA BOLDS-JOHNSON <br> 900 Horse Collar Road <br> Accokeek, MD  20607 <br> *Resident of Prince George's County* <br><br> Plaintiff, <br><br> v. <br><br><br><br> MEDSTAR SOUTHERN MARYLAND <br> HOSPITAL CENTER, INC. <br> 7503 Surrats Road <br> Clinton, MD 20735 <br> *Resident of Prince George's County, Md.* <br><br>   and <br><br> MEDSTAR MEDICAL GROUP, LLC <br> 5565 Sterrett Place <br> Columbia, MD 21044 <br> *Resident of Howard County, Md.* <br><br> Defendants. | **Civil Action No: 8:24-cv-428** <br><br><br><br> For (i) Violations of 42 U.S.C. §1981 and <br> (ii) Violations of 42 U.S.C. §1985 |

*Serve both Parties at:*
**JENNIFER L. CURRY**
Managing Shareholder, Co-Chair L&E Health
*c/o Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*
100 Light Street, 19th Floor
Baltimore, MD 21202
Phone: (410) 862-1183
Fax:    (443) 263-7583

## VERIFIED COMPLAINT FOR MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement

1. This Action arises from, and is brough to remedy, the documented, illegal misconduct of Defendant MedStar Southern Maryland Hospital Center, Inc., and Defendant MedStar Medical Group, LLC (together, "MedStar" or "Defendant"), dating to Autumn 2020 and continuing into the present against Plaintiff LaToya Bolds-Johnson ("Plaintiff" or "Bolds-Johnson").

2. Defendants are guilty of civil rights violations including a now-exposed conspiracy barred by the above-captioned and below-cited federal civil rights statutes enacted in 1866 and 1871.

3. The three Exhibits to this Complaint (**Exhibit A**, **Exhibit B**, and **Exhibit C**) plainly evidence, respectively, that (a) one federal agency has found probable cause that Defendant discriminates based on race against Plaintiff, (b) one state agency had forewarned the hospital of its obligations not to discriminate against patients the way Defendant effectively encourages a Caucasian female physician's assistant to discriminate against African-American male patients being triaged, and (c) Defendant acknowledged, in Defendant's damning follow-up letter to Plaintiff's complaints, the racial discrimination by that supervisor in Defendant's Emergency Room against African-American male patients.

4. Recent sworn testimony has revealed the extent of a civil rights conspiracy to violate Plaintiff's rights beyond her employment with Defendant: Plaintiff has learned that Defendant simultaneously covered for Defendant's chosen discriminator – who still works for Defendant, even while Defendant terminated Plaintiff's employment and sustained its retaliation against her as she continued reporting out over the last three years, including through state authorities and a state legislator who has intervened opposing Defendant's naked civil rights violations against Plaintiff and African-American patients in Prince George's County.

**Facts**

5. Plaintiff is a 39-year-old, college-educated, married, mother-of-three, Prince George's County, Maryland-domiciled, African-American healthcare professional who served for approximately three years as a Senior Physician Assistant with Medstar Medical Group.

6. Defendant is two (2) large, long-established cooperating medical-services businesses respectively in Prince George's County, Maryland, and Howard County, Maryland, that effectively serve as two divisions of the same organization (MedStar) but that are legally incorporated and managed separately.

7. The MedStar corporation and the MedStar limited-liability company operate under overlapping, cross-pollenated policies, procedures, codes of conduct, and employment agreements.

8. Defendant's services are the ownership and/or management of full-service hospitals and medical practices throughout the Mid-Atlantic region, with ownership of scores of locations cooperating with one another throughout Maryland.

9. On January 7, 2021, Defendant, operating its hospital MedStar Southern Maryland Hospital Center, Inc., which serves a Black-majority county of suburban and exurban Washington, D.C., terminated the employment of Plaintiff after and because of her engagement in protected civil-rights activity and because of her race (African-American).

10. Defendant challenged the termination at the United States Equal Employment Opportunity (EEOC) by filing a Charge of Discrimination as soon as she was dismissed.

11. As the EEOC concluded in its "Determination" signed by Baltimore Field Office Director Rosemarie Roads and dated October 29, 2021 "[… T]here is reasonable cause to believe that

Respondent [MedStar] violated Title VII by retaliating against Charging Party [Plaintiff] when it disciplined and discharged her after she engaged in a protected activity."

12. Plaintiff's EEOC charge alleged that "she was discriminated and retaliated against with respect to discipline and discharge because of her race (Black), in violation of Title VII," the EEOC noted.

13. The EEOC conclusions were as damning as Defendant's conduct was devasting to Plaintiff, her career, and her physical health.

14. The EEOC's Baltimore director asserted:

   a. The record shows that Respondent hired Charging Party on March 1, 2018[,] as an Emergency Medicine Physician Assistant. On March 1, 2020, Charging Party advised Respondent of her intention to resign with 90 days' notice pursuant to the terms of her employment contract. Documentary evidence obtained during the investigation reveals that on April 3, 2020, Charging Party rescinded her resignation and on July 19, 2020, Respondent executed a new full-time employment contract to Charging Party with intent to retain her employment. The contract renewed reinstated Charging Party's employment status to fulltime effective July 29, 2020.

   b. On July 31, 2020, Charging Party met with Dr. Kevin Reed, Medical Director, and human resources, she submitted a formal complaint against Ms. Jessica Fuller, Chief PA looking up criminal histories of only African American patients when seeking emergency medical attention. Charging Party advised Dr. Reed that as early as 2018, Ms. Fuller[] had been racially profiling African American patients that came into the Emergency Department. In August 2020, Ms. Fuller and Dr, Reed began to retaliate against Charging Party. Testimonial evidence obtained from witnesses affirmed that

after Charging Party filed her complaint, Dr. Reed took concerted efforts to confront and reprimand her in front of staff regarding Charging Party's OSHA approved N95 respirator on two different occasions, while on September 10, 2020, Dr. Reed affirmatively told other members of staff that the mask being worn by Charging Party was acceptable to others.  On October 9, 2020, Respondent retaliated against Charging Party by failing to honor the new full-time employment contract issued to her on July 19, 2020[,] and discharged her without cause.

   c. Based on the foregoing, there is reasonable cause to believe that Respondent violated Title VII by retaliating against Charging Party when it disciplined and discharged her after she engaged in a protected activity.

   d. Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. A letter initiating conciliation proposal will be sen[t] to Respondent within 10 days from the date of this Determination.

15. A true and correct photocopy of the EEOC's determination letter is attached hereto as **<u>Exhibit A</u>**.

***EEOC exposure causes Defendant's chief agent to accelerate attacks***

16. The EEOC "cause-finding" notice prompted months of one-on-one negotiation between Bolds-Johnson and the chief agent of Defendant, Attorney Jennifer Curry.

17. Plaintiff had pursed her formally filed allegations of violations of Title VII of the federal Civil Rights Act of 1964 *pro se* throughout the EEOC proceeding for more than a year, until Defendants' agent grew so abusive by the time the parties were months into EEOC-coordinated conciliation that Plaintiff was forced to retain counsel and push back in August 2022.

18. Defendant's discriminatory actions toward African-American male patients in its Emergency Room already had been established by the internal reporting of the in-good-standing employee Bolds-Johnson, as explained and exhibited *infra.*

19. On September 24, 2019, the Maryland Department of Health had written to all "Hospital Presidents and CEOs," including those of Defendant, to advise of a new law in Maryland that was taking effect on October 1, 2019, of that year to prevent race and sex discrimination against patients in their care, among other protections.

20. Patricia Tomsko Nay, M.D., Executive Director, Office of Health Care Quality, proclaimed Governor Larry Hogan's signing into law of House Bill 145, an updated Maryland "Patient Bill of Rights."

21. Invoking the parallel, mandatory federal policy codified in C.F.R. 482.13 (the "Centers for Medicare and Medicaid Services Condition of Participation for Patients' Rights"), the state official advised, "The law is applicable to all areas of the hospital under its license."

22. A true and correct copy of the Maryland state government's official guidance to hospitals on the law and public policy is attached hereto as **Exhibit B.**

23. Plaintiff had exposed and reported a Maryland Patient's Bill of Rights-violative scheme by which an officious, white, biased, voluntarily – Fuller, a *supervisor* – profiled innumerable Black men who had checked into the emergency room.

24. Said profiling by Fuller included, among other acts, singling out Black men because they were Black men and subjecting them to disparate treatment by (1) searching the Internet for any evidence of any criminal activity of only that profile of patient, and then (2) defaming the Black male patients to her colleagues by disclosing her research whenever she thought she had found "hot" results.

25. Fuller could not deny that she had engaged in the above-described race- and sex-based profiling in her sworn testimony before a court reporter in January 2024.

***Racially discriminatory white physician assistant protected by MedStar, who justified, in a post-investigation letter, its violations of public policy harming Black-male emergency-room patients***

26. Plaintiff reported Defendant internally and, when MedStar demonstrated that it did not care and would do nothing, externally to state authorities.

27. What happened after Plaintiff exposed Defendant flew in the face of the statute and public policy binding Defendant: Defendant MedStar **protected** the actions *of the guilty white physician assistant* – Jessica Fuller, who still works at MedStar to this day, employed in good standing in the same supervisory role, and is earning a paycheck and other incentives with MedStar!

28. Defendant MedStar's confession of the actions of Fuller was written in a letter to Plaintiff, dated October 29, 2020.

29. A true and correct copy of Defendant's Fuller-clearance letter against Plaintiff is attached hereto as **Exhibit C**.

30. Defendant MedStar Medical Group, LLC's Human Resources Manager Nicole M. Holland concluded in the letter to Plaintiff:

> We have investigated your concerns regarding the Chief Physician Assistant's access and discussion of patient criminal histories and your complaint that you raised these concerns to leadership but did not receive a response. Described concerns took place between 2018 and July 2020. While our

>   investigation did not substantiate behavior that rises to the level of actionable discrimination or harassment, we confirmed that patients' criminal history or status are sometimes shared in the workplace and that you first raised concerns about this in late July 2020. Sometimes a patient's criminal status is relevant, for example when they come to our emergency departments in police custody or are deemed a danger to themselves or others. The concerns that you raised were taken seriously at the time and appropriate corrective actions were taken to ensure that our patients and colleagues are treated with dignity and respect and that a patient's criminal history or status is not shared or referenced unnecessarily. We regret that you did not receive confirmation that your concerns were addressed timely. As you know, it is not our policy to disclose specific disciplinary actions to other associates. Should you witness any exchanges in the future that raise concerns for you that these principles are not being respected, please contact me immediately.

31. All of the reporting and investigating referenced in the Fuller affair occurred over the backdrop of the long-hot year of police killings of African-American men and the so-called "racial reckoning" that called the world's attention to the problems of racial discrimination in our society. But while the world was waking up, Defendant was covering up.

32. In fact, the recent record from January 2024 – more than four years later – reveals that Defendant's letter was part of a cover-up, as it has harbored the racially biased white employee, Fuller.

33. In fact, as per under-oath, sworn, court-reported testimony by Fuller, defended by Jennifer Curry on January 15, 2024, Plaintiff learned for the first time that ***Defendant has taken ZERO corrective action against Fuller for her racism against the African-American male patients, and MedStar has retained her and given Fuller at least one raise since Fuller's transgressions of innumerable African-American male patients' rights under the Maryland Patient's Bill of Rights!***

34. Defendant knew how serious the transgressions were for patients, because Plaintiff reported one example of a patient repelled from the hospital over the disparate treatment.

35. In or about July 2020, an African-American male patient later known to have had a criminal record apparently wholly unrelated to his medical issue came urgently to the emergency room.

36. Hours and hours passed, and while Fuller went on her research hunt, he was left untreated.

37. The Black male patient eventually fled the MedStar hospital due to the effects of the racially disparate treatment (substandard or no care at all from hospital doctors, physician's assistants, or nurses), even though, testimony has shown, he had gross painless blood in his urine – a condition that Plaintiff warned colleagues is medically *presumed to be **bladder cancer** until proven otherwise.*

38. Another Black male presented as a patient in Defendant's emergency room with meningitis while Plaintiff and Fuller were on shift.

39. Rather than administering or directing a staffer to administer care, Fuller immediately took to her Internet research again, finding that the patient had a warrant.

40. Fuller threatened to call the police on him instead of providing emergency treatment to him.

41. He fled.

42. Plaintiff – an African-American woman, wife, and mother – reported Fuller's pattern and practice of discriminatory misconduct formally and in multiple internal and governmental outlets.

43. Defendant terminated the employment of Plaintiff on January 5, 2021.

44. Maryland Delegate Kriselda Valderrama, who represents Prince George's County in the State House, conferred with Plaintiff and then intervened in 2022, raising pointed questions in formal, official communication with Defendant over Defendant's civil-rights violations.

***Plaintiff re-lives trauma of MedStar while battling onset of her own cancer, enduring harsh chemotherapy as Defendant Agent Jennifer Curry browbeats her harder and harder post-employment***

45. Prior to MedStar's actions during and after her employment, Plaintiff had been a portrait of health in her early thirties.

46. At just 35 years old and previously in fine health, Plaintiff, starting in July 2021, entered into an aggressive treatment regimen including chemotherapy.

47. The wrongful termination caused the onset of a cancer diagnosis for Plaintiff in late Spring 2021.

48. The EEOC investigation process and mediation went on as normal, however, with Plaintiff *pro se*.

49. Fully aware that the wrongful termination had been accompanied by the onset of cancer, Curry nevertheless badgered and cudgeled Plaintiff throughout the entire EEOC processing.

50. Curry's negating of Plaintiff's attempts to have MedStar atone for the costly termination and medical harm led to distress and relapses for Plaintiff continuing through late Summer 2022 as Defendant's Agent Jennifer L. Curry intentionally exacerbated the caused-by-Defendant cancer symptoms by browbeating the dismissed Plaintiff in one-on-one settlement negotiations between Curry and Bolds-Johnson, mediated by an EEOC official.

51. In the final analysis, MedStar walked away, refusing to pay even the equivalent of two years of pay and other benefits plus attorney fees for what wound up being the two law firms retained simultaneously by Plaintiff to resist MedStar's attempts to destroy her career, her future, and her very health.

52. The EEOC proceeding was used by Defendant as a cruel charade, through which an in-chemotherapy African-American woman victim of Defendant's was professionally tortured over weeks and left even more injured than when she entered, while Defendant walked.

53. Rule 408 of the Federal Rules of Evidence expressly provides that a court may admit evidence of compromise offers and negotiations not to evidence value of a case and/or any alleged admission of culpability by a party, but rather, "for ANOTHER purpose [besides trying to establish liability or damages based on offers and counteroffers, which are clearly inadmissible], such as proving a witness's bias or prejudice, NEGATING A CONTENTION OF UNDUE DELAY, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b) [ALLCAPS emphases added].

54. Following Rule 408 with this plain exception, our federal trial courts admit evidence of compromise offers and negotiations for the purpose of showing that the parties engaged in interactive processes. *See, e.g., Carney v. American University*, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (noting that settlement letters "can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (discrimination)"). *See also Cook v. Morgan Stanley Smith Barney*, No. H-13-1321, 2014 WL 4064000, at *6 (S.D. Tex. Aug. 15, 2014) (admitting 408 evidence because it was "being used not to show liability but to show that [defendant] was engaging in the interactive process"); *Linebarger v. Honda of Am. Mfg., Inc.*, 870 F. Supp.2d 513, 521 n.2 (S.D. Ohio 2012) (same); and *Williams v. British Airways*, PLC, Nos. 04-cv0471 and 06-cv-5085, 2007 WL 2907426, at *8 n.13 (E.D.N.Y. Sept. 27, 2007) (finding that notwithstanding Rule 408, "settlement discussions may be considered in the ADA context for the purpose of assessing a party's participation in the interactive process").

55. Other courts have similarly held that settlement evidence is not barred when a claim is based upon some independent wrong evidenced in the course of settlement discussions. *See, e.g., Scott v. Goodman*, 961 F.Supp. 424, 438 (E.D.N.Y. 1997) *aff'd. sub nom. Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999) ("Although Goodman's offer to settle would not be admissible as an admission of liability on the underlying anti-union claim Rule 408's prohibition is 'inapplicable' where, as here, the waiver-of-rights claim is based upon an alleged wrong – i.e. the conditioning of Scott's reinstatement on the waiver of her First Amendment right to commence a lawsuit – committed during the course of alleged settlement discussions. . . . Goodman's statements are the very source and substance of a different and independent First Amendment cause of action.").

56. The settlement fiasco was part of the calculated plan by MedStar, in both Defendant forms, to harass and intimidate Plaintiff, violating her rights to legal process, the benefit of federal laws including Title VII, and fair compensation.

57. Defendant's conduct has been designed, orchestrated, and carried out to violate the civil rights of Plaintiff LaToya Bolds-Johnson.

58. The conduct of the dually-yoked Defendant set off a tempest of race-based employment discrimination as barred in the Civil Rights Act of 1866 (Section 1981) including reprisal against Plaintiff, and with all the elements Congress set forth in its 1871 passage of the civil-rights conspiracy statute's Section 1983 (also known as the Ku Klux Klan Act) in order to protect the kind of deadly abuse of African-Americans that MedStar has intentionally imposed on its African-American male emergency-room patients and its wrongfully terminated Senior Physician Assistant LaToya Bolds-Johnson, who was working with the MedStar and governmental-reporting systems to stop it.

## **Counts**

**COUNT ONE – DISRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**
**(Race Discrimination in Contractual Relations and Rights)**

59. Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

60. Plaintiff is an African-American citizen of the United States, and thus is protected categorically under 42 U.S.C. § 1981, the Civil Rights Act of 1866.

61. Congress enacted the Civil Rights Act of 1866 in the aftermath of the Civil War, animating the Fourteenth Amendment of the federal constitution by conferring upon "all citizens" and "all persons" the same rights to own property and to make and enforce contracts, respectively.

62. In relevant part, Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts … as is enjoyed by white citizens[.]" Because the employer-employee relationship is a type of contractual relationship, Section 1981 prohibits racial discrimination in the employment context.

63. Section 1981 functions similarly to Title VII of the Civil Rights Act of 1964, in that it prohibits employers from intentionally discriminating against employees on the basis of race.

64. The legal tests for proving a racially hostile work environment asserted under Section 1981 and Title VII are the same. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).

65. Here, Plaintiff has shown that Defendant committed the requisite "(1) unwelcome conduct; (2) that is based on the plaintiff's … race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id*. at 277 (*citing Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)).

66. At all stages, Defendant intended to commit the hostility, harassment, and race discrimination before, during, and after Plaintiff's employment, and when she was engaged in avenging her federal rights at the EEOC through conciliation in late summer 2022.

67. In *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1982), the Supreme Court explained that Section 1981 was enacted to prevent this kind of purposeful discrimination – getting rid of Black Bolds-Johnson to keep the white discriminator Fuller, chilling any further protected activity by Blacks with the example made out of Bolds-Johnson and her plight: termination, cancer, and non-conciliation. *See Gen. Bldg. Contractors Ass'n*, 458 U.S., 383 n.8.

68. The text of Section 1981 does not specify a particular time limit within which claims must be filed, and so Section 1981 violations are subject to the general four-year statute of limitations for civil actions arising under federal law, 28 U.S.C. § 1658.

69. Section 1981 claims may therefore be brought in court within four years of the discriminatory action at issue.

70. Moreover, because the terms of Section 1981 apply to all forms of contracting, it applies to all employers regardless of size — including employers with fewer than fifteen employees.

71. Finally, Section 1981 allows recovery of compensatory and punitive damages, and does not cap damages. The statute authorizes compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses[.]" 42 U.S.C. § 1981a(b)(3). The same statute further allows punitive damages against private-sector employers for Title VII violations if the plaintiff shows the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual," 42 U.S.C. §

1981a(b)(1), as MedStar has done with both the presumed bladder-cancer Black male emergency-room patient and in Plaintiff's employment and post-employment ordeal with MedStar.

72. Under Section 1981, punitive damages may be awarded "for conduct [by the defendant] exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right," *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484, 489 (4th Cir. 1988); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441 (4th Cir. 2000). This standard derives from the Supreme Court's opinion in *Smith v. Wade*, 461 U.S. 30 (1983), in which the Court held that punitive damages are available under the common law in an action under the parallel civil rights statute 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

73. Defendant MedStar violated the civil rights and equal protection of the laws previously enjoyed by Ms. Bolds-Johnson by willfully discriminating based on race in the execution of her employment contract, and in her execution of her rights as a settling party in a government-backed determination that her employer had discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq.

74. Defendant's actions were done in bad faith, with malice, and with willful disregard for Plaintiff's legal rights.

75. Defendant's actions directly and proximately caused, and continue to cause, Plaintiff to suffer financial, reputational, physical, and emotional harm.

76. Accordingly, this Action seeks injunctive relief of reinstatement to her previous job plus the award of compensatory damages to redress the harm to the Plaintiff caused by the Defendant's in race discrimination, harassment, and hostility to interfere with her work-contractual rights and

punitive damages to punish the Defendants for the reckless and malicious manner in which they acted and to enjoin and deter a recurrence of this unlawful conduct.

## COUNT TWO – DISRIMINATION IN VIOLATION OF 42 U.S.C. § 1985
### (Conspiracy to Interfere with Civil Rights)

77. Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

78. Ms. Bolds-Johnson is an African-American citizen of the United States, and thus is protected categorically under 42 U.S.C. § 1985.

79. Defendant, in both manifestations (the LLC and the Corporation "Inc.") in tandem, violated the civil rights and equal protection of the laws previously enjoyed by Ms. Bolds-Johnson by willfully interfering with her reporting to the authorities and engaging in federal conciliation in spite of the civil laws protecting Plaintiff.

80. Defendant conspired to prevent, by force, intimidation and threats, the Plaintiff from exercising her rights and attending to her urgent medical needs after its conduct caused her cancer.

81. In furtherance of their common goal of preventing Plaintiff from actualizing resolution of her cases before the EEOC and enjoying a recovery, Defendant operated in violation of the civil-rights conspiracy statute.

82. MedStar […] Inc. and MedStar […] LLC (again, defined as "Defendant" in the body of this Complaint) acted in concert to incite and then carry out a physically harmful program violating Plaintiff's person.

83. Defendant promoted an assembly of persons to engage in tumultuous and violent conduct or the threat of it that created grave danger of harm to the Plaintiff and other similarly situated African-Americans, including the patients of MedStar Southern Maryland Hospital Center.

84. This conduct jointly undertaken to threaten the Plaintiff and others in order to disrupt civil rights activity in the nation's capital during the racial-reckoning year 2020 was part of an ongoing course of action pursued by the Defendant for the purpose of racially intimidating and preventing African-Americans from exercising their civil rights.

85. Defendant's concerted destruction of Plaintiff's financial prospects and her health, and continuous drain on her finances amid chemotherapy, were a direct, intended, and foreseeable result of the Defendant's unlawful conspiracy.

86. The cycle of concerted conduct was instigated according to a common plan that Defendant pursued since being targeted by the EEOC in 2021.

87. Defendant sought to prevent Plaintiff from, and punish her for, exercising her legal rights, under Maryland state law, not to face "wrongful discharge in violation of public policy" as expounded in *Wholey v. Sears Roebuck*, 370 Md. 38, 803 A.2d 482, 489 (2002).

88. As part of this unified program of intimidation, the Defendant acted in concert to spearhead the assault on Plaintiff as soon as they learned in 2020 of her reporting the discriminations of Fuller and more.

89. Through its agent Jennifer Curry during the EEOC process, Defendant performed "without legal justification or excuse" and was motivated by "evil or rancorous motive," actuating malice as defined and outlawed in *Kessler v. Equity Mgmt., Inc.*, 82 Md. App. 577, 591 (1990).

90. Defendant's cancer-causing effect on Plaintiff, and the exacerbation of said effect by prolonging the matter beyond the EEOC into the present, embodied Defendants' malice, evil motive, recklessness, and callous indifference with regard to Plaintiff and her rights.

91. Defendant deployed all of these actions amid the backdrop of the unanimous Supreme Court decision decided Feb. 8, 2024, protecting workers who report out such employer violations:

*Murray v. UBS Securities, LLC* (No. 22-660, the preliminary syllabus of which is available at https://www.supremecourt.gov/opinions/23pdf/22-660_7648.pdf.

92. Defendant's actions were done in bad faith, with malice, and with willful disregard for Plaintiff's legal rights.

93. Defendant's actions directly and proximately caused, and continue to cause, Plaintiff Bolds-Johnson to suffer financial, reputational, physical, and emotional harm.

94. Defendant acted in violation of Section 1985, which provides, in relevant part:

> **(2) OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR**
>
> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;
>
> **(3) DEPRIVING PERSONS OF RIGHTS OR PRIVILEGES**
>
> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or

> privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

95. Accordingly, this Action seeks injunctive relief with the award of compensatory damages to redress the harm to the Plaintiff caused by the Defendant's use of intimidation, harassment and threats of violence to interfere with his legal rights and punitive damages to punish the Defendant for the reckless and malicious manner in which they acted and to enjoin and deter a recurrence of this unlawful conduct.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff prays this Court for the following relief:

96. Enter a judgment in Plaintiff's favor and against Defendant declaring that Defendant violated the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981;

97. Enter a judgment in Plaintiff's favor and against Defendant declaring that Defendant violated the Civil Rights Act of 1871 as amended, 42 U.S.C. § 1985;

98. Award Plaintiff injunctive relief by ordering Defendant to never again communicate with Plaintiff and Plaintiff's physicians plus compensation for the costs and fees incurred for services caused by the caption-delineated civil wrongs that animated Defendant's civil-rights conspiracy against Plaintiff;

99. Award Plaintiff damages in an amount to be proven at trial for economic losses, pain and suffering/emotional distress, and loss of enjoyment of life that he has experienced as a result of Defendant's unlawful conduct;

100. Award Plaintiff punitive damages in the greater of $20 million or an amount to be determined through trial by jury;

101.  Award Plaintiff reasonable attorneys' fees, as well as pre-judgment and post-judgment interest, litigation expenses, and costs; and

102.  Grant such other and further relief which the Court may deem appropriate.

## JURY DEMAND

Plaintiff requests a jury trial for all the counts in this case.

Respectfully submitted,

**/s/ Amos Jones**
(D.C Bar No. 974919)
*Counsel for Plaintiff LaToya Bolds-Johnson*
AMOS JONES LAW FIRM
1150 K ST NW
Washington, DC  20005-6809
jones@amosjoneslawfirm.com
Telephone: (202) 351-6187, Extension 4
Facsimile: (202) 478-1654


Date: Tuesday February 13, 2024